# GARNER *v.* UNITED STATES

No. 74–100.   Argued November 4, 1975—Decided March 23, 1976

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and REHNQUIST, JJ., joined. MARSHALL, J., filed an opinion concurring in the judgment, in which BRENNAN, J., joined, *post,* p. 666. STEVENS, J., took no part in the consideration or decision of the case.

*Burton Marks* argued the cause for petitioner. With him on the brief was *Jonathan K. Golden.*

*Deputy Solicitor General Jones* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Assistant Attorney General Thornburgh, Deputy Solicitor General Frey, Jerome M. Feit,* and *Frederick W. Read III.*

MR. JUSTICE POWELL delivered the opinion of the Court.

This case involves a nontax criminal prosecution in which the Government introduced petitioner's income tax returns to prove the offense against him. The question is whether the introduction of this evidence, over petitioner's Fifth Amendment objection, violated the privilege against compulsory self-incrimination when petitioner made the incriminating disclosures on his returns instead of then claiming the privilege.

I

Petitioner, Roy Garner, was indicted for a conspiracy involving the use of interstate transportation and communication facilities to "fix" sporting contests, to transmit bets and information assisting in the placing of bets, and to distribute the resultant illegal proceeds. 18 U. S. C. §§ 371, 224, 1084, 1952.[1] The Government's case was that conspirators bet on horse races either having fixed them or while in possession of other information unavailable to the general public. Garner's role in this scheme was the furnishing of inside information. The case against him included the testimony of other conspirators and telephone toll records that showed calls from Garner to other conspirators before various bets were placed.

The Government also introduced, over Garner's Fifth Amendment objection, the Form 1040 income tax returns that Garner had filed for 1965, 1966, and 1967. In the 1965 return Garner had reported his occupation as "pro-

---

[1] Garner was also indicted for aiding and abetting the violation of 18 U. S. C. § 1084, the substantive offense involving transmission of bets and betting information. The trial judge acquitted him on this count at the close of the Government's case.

fessional gambler," and in each return he reported substantial income from "gambling" or "wagering." The prosecution relied on Garner's familiarity with "the business of wagering and gambling," as reflected in his returns, to help rebut his claim that his relationships with other conspirators were innocent ones.

The jury returned a guilty verdict. Garner appealed to the Court of Appeals for the Ninth Circuit, contending that the privilege against compulsory self-incrimination entitled him to exclude the tax returns despite his failure to claim the privilege on the returns instead of making disclosures. Sitting en banc the Court of Appeals held that Garner's failure to assert the privilege on his returns defeated his Fifth Amendment claim. 501 F. 2d 236.[2] We agree.

## II

In *United States* v. *Sullivan,* 274 U. S. 259 (1927), the Court held that the privilege against compulsory self-incrimination is not a defense to prosecution for failing to file a return at all. But the Court indicated that the privilege could be claimed against specific disclosures sought on a return, saying:

> "If the form of return provided called for answers that the defendant was privileged from making he could have raised the objection in the return, but could not on that account refuse to make any return at all." *Id.,* at 263.[3]

---

[2] The panel of the Court of Appeals that originally heard the case had accepted Garner's contention and reversed, one judge dissenting. 501 F. 2d 228. The en banc court affirmed the conviction by a 7-to-5 vote.

[3] In *Sullivan,* Mr. Justice Holmes, writing for the Court, said: "It would be an extreme if not an extravagant application of the Fifth Amendment to say that it authorized a man to refuse to state the amount of his income because it had been made in crime. But if the defendant desired to test that or any other point he should

Had Garner invoked the privilege against compulsory self-incrimination on his tax returns in lieu of supplying the information used against him, the Internal Revenue Service could have proceeded in either or both of two ways. First, the Service could have sought to have Garner criminally prosecuted under § 7203 of the Internal Revenue Code of 1954 (Code), 26 U. S. C. § 7203, which proscribes, among other things, the willful failure to make a return.[4] Second, the Service could have sought to complete Garner's returns administratively "from [its] own knowledge and from such information as [it could] obtain through testimony or otherwise." 26 U. S. C. § 6020 (b)(1). Section 7602 (2) of the Code authorizes the Service in such circumstances to summon the taxpayer to appear and to produce records or give testimony. 26

have tested it in the return so that it could be passed upon." 274 U. S., at 263–264.

We have no occasion in this case to decide what types of information are so neutral that the privilege could rarely, if ever, be asserted to prevent their disclosure. See also *California* v. *Byers*, 402 U. S. 424 (1971). Further, the claims of privilege we consider here are only those justified by a fear of self-incrimination other than under the tax laws. Finally, nothing we say here questions the continuing validity of *Sullivan*'s holding that returns must be filed.

[4] Title 26 U. S. C. § 7203 reads in full:

"Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return (other than a return required under authority of section 6015), keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution."

U. S. C. § 7602 (2).[5]   If Garner had persisted in his claim when summoned, the Service could have sued for enforcement in district court, subjecting Garner to the threat of the court's contempt power.   26 U. S. C. § 7604.[6]

Given *Sullivan*, it cannot fairly be said that taxpayers are "volunteers" when they file their tax returns.   The Government compels the filing of a return much as it compels, for example, the appearance of a "witness"[7] before a grand jury.   The availability to the Service of § 7203 prosecutions and the summons procedure also induces taxpayers to disclose unprivileged information on their

---

[5] Title 26 U. S. C. § 7602 reads in part:

"For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax . . . , or collecting any such liability, the Secretary or his delegate is authorized—

.         .         .         .         .

"(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material  to such inquiry . . . ."

[6] Title 18 U. S. C. § 6004 would appear to authorize the Service, as an alternative to an enforcement suit, to order a summoned taxpayer to make disclosures in exchange for immunity.   We are informed, however, that it has not been the Service's practice to utilize § 6004.   Brief for United States 19, and n. 11.

[7] The term "witness" is used herein to identify one who, at the time disclosures are sought from him, is not a defendant in a criminal proceeding.   The more frequent situations in which a witness' disclosures are compelled, subject to Fifth Amendment rights, include testimony before a grand jury, in a civil or criminal case or proceeding, or before a legislative or administrative body possessing subpoena power.

returns. The question, however, is whether the Government can be said to have compelled Garner to incriminate himself with regard to specific disclosures made on his return when he could have claimed the Fifth Amendment privilege instead.

### III

We start from the fundamental proposition:

> "[A] witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. *Kastigar* v. *United States*, 406 U. S. 441 (1972). Absent such protection, if he is nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution. *Bram* v. *United States*, [168 U. S. 532 (1897)]; *Boyd* v. *United States*, [116 U. S. 616 (1886)]." *Lefkowitz* v. *Turley*, 414 U. S. 70, 78 (1973).

See *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52, 57 n. 6 (1964).

Because the privilege protects against the use of compelled statements as well as guarantees the right to remain silent absent immunity, the inquiry in a Fifth Amendment case is not ended when an incriminating statement is made in lieu of a claim of privilege. Nor, however, is failure to claim the privilege irrelevant.

The Court has held that an individual under compulsion to make disclosures as a witness who revealed information instead of claiming the privilege lost the benefit of the privilege. *United States* v. *Kordel*, 397 U. S. 1, 7–10 (1970). Although *Kordel* appears to be the only square holding to this effect, the Court frequently has recognized the principle in dictum. *Maness* v. *Meyers*, 419 U. S. 449, 466 (1975); *Rogers* v. *United States*, 340

U. S. 367, 370–371 (1951); *Smith* v. *United States,* 337 U. S. 137, 150 (1949); *United States* v. *Monia,* 317 U. S. 424, 427 (1943); *Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103, 112–113 (1927).[8] These decisions stand for the proposition that, in the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not "compelled" him to incriminate himself.[9]

> "The Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he

---

[8] The Court also has held, analogously, that a witness loses the privilege by failing to claim it promptly even though the information being sought remains undisclosed when the privilege is claimed. *United States* v. *Murdock,* 284 U. S. 141, 148 (1931), disapproved on other grounds, *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52 (1964); see *Rogers* v. *United States,* 340 U. S., at 371.

[9] This conclusion has not always been couched in the language used here. Some cases have indicated that a nonclaiming witness has "waived" the privilege, see, *e. g., Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103, 113 (1927). Others have indicated that such a witness testifies "voluntarily," see, *e. g., Rogers* v. *United States, supra,* at 371. Neither usage seems analytically sound. The cases do not apply a "waiver" standard as that term was used in *Johnson* v. *Zerbst,* 304 U. S. 458 (1938), and we recently have made clear that an individual may lose the benefit of the privilege without making a knowing and intelligent waiver. See *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 222–227, 235–240, 246–247 (1973). Moreover, it seems desirable to reserve the term "waiver" in these cases for the process by which one affirmatively renounces the protection of the privilege, see, *e. g., Smith* v. *United States,* 337 U. S. 137, 150 (1949). The concept of "voluntariness" is related to the concept of "compulsion." But it may promote clarity to use the latter term in cases where disclosures are required in the face of a claim of privilege, while reserving "voluntariness" for the concerns discussed in Part IV, *infra,* at 656–665, where we consider whether some factor prevents a taxpayer desiring to claim the privilege from doing so.

must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment." *United States* v. *Monia, supra,* at 427 (footnote omitted).

In their insistence upon a claim of privilege, *Kordel* and the older witness cases reflect an appropriate accommodation of the Fifth Amendment privilege and the generally applicable principle that governments have the right to everyone's testimony. *Mason* v. *United States,* 244 U. S. 362, 364–365 (1917); see, *e. g., Branzburg* v. *Hayes,* 408 U. S. 665, 688 (1972); *Kastigar* v. *United States,* 406 U. S. 441, 443–445 (1972). Despite its cherished position, the Fifth Amendment addresses only a relatively narrow scope of inquiries. Unless the government seeks testimony that will subject its giver to criminal liability, the constitutional right to remain silent absent immunity does not arise. An individual therefore properly may be compelled to give testimony, for example, in a noncriminal investigation of himself. See, *e. g., Gardner* v. *Broderick,* 392 U. S. 273, 278 (1968). Unless a witness objects, a government ordinarily may assume that its compulsory processes are not eliciting testimony that he deems to be incriminating. Only the witness knows whether the apparently innocent disclosure sought may incriminate him, and the burden appropriately lies with him to make a timely assertion of the privilege. If, instead, he discloses the information sought, any incriminations properly are viewed as not compelled.

In addition, the rule that a witness must claim the privilege is consistent with the fundamental purpose of the Fifth Amendment—the preservation of an adversary system of criminal justice. See *Tehan* v. *United States ex rel. Shott,* 382 U. S. 406, 415 (1966). That system is undermined when a government deliberately seeks to

avoid the burdens of independent investigation by compelling self-incriminating disclosures. In areas where a government cannot be said to be compelling such information, however, there is no such circumvention of the constitutionally mandated policy of adversary criminal proceedings. Cf. *Counselman* v. *Hitchcock*, 142 U. S. 547, 562–565 (1892); *California* v. *Byers*, 402 U. S. 424, 456–458 (1971) (Harlan, J., concurring in judgment).

## IV

The information revealed in the preparation and filing of an income tax return is, for purposes of Fifth Amendment analysis, the testimony of a "witness," as that term is used herein. Since Garner disclosed information on his returns instead of objecting, his Fifth Amendment claim would be defeated by an application of the general requirement that witnesses must claim the privilege. Garner, however, resists the application of that requirement, arguing that incriminating disclosures made in lieu of objection are "compelled" in the tax-return context. He relies spefically on three situations in which incriminatory disclosures have been considered compelled despite a failure to claim the privilege.[10] But in each of these narrowly defined situations, some factor not present here made inappropriate the general rule that the privilege

[10] These arguments were in fact advanced in the dissent from the en banc decision below, which Garner adopted as his brief on the self-incrimination issue. Brief for Petitioner 8. Garner's brief itself principally advances two other claims of error. The facts underlying these claims were not presented in the petition for certiorari, see this Court's Rule 23 (1)(e), which alone would have merited a denial of a petition not containing the self-incrimination claim. Rule 23 (4). Further, these contentions were not deemed of sufficient merit to warrant discussion below. In those circumstances we consider it inappropriate to reach them.

must be claimed. In each situation the relevant factor was held to deny the individual a "free choice to admit, to deny, or to refuse to answer." *Lisenba* v. *California,* 314 U. S. 219, 241 (1941). For the reasons stated below, we conclude that no such factor deprived Garner of that free choice.

### A

Garner relies first on cases dealing with coerced confessions, *e. g., Miranda* v. *Arizona,* 384 U. S. 436 (1966), where the Court has required the exclusion of incriminating statements unless there has been a knowing and intelligent waiver of the privilege regardless of whether the privilege has been claimed. *Id.,* at 467–469, 475–477. Garner notes that it has not been shown that his failure to claim the privilege was such a waiver.

It is evident that these cases have little to do with disclosures on a tax return. The coerced-confession cases present the entirely different situation of custodial interrogation. See *id.,* at 467. It is presumed that without proper safeguards the circumstances of custodial interrogation deny an individual the ability freely to choose to remain silent. See *ibid.* At the same time, the inquiring government is acutely aware of the potentially incriminatory nature of the disclosures sought. Thus, any pressures inherent in custodial interrogation are compulsions to incriminate, not merely compulsions to make unprivileged disclosures. Because of the danger that custodial interrogation posed to the adversary system favored by the privilege, the Court in *Miranda* was impelled to adopt the extraordinary safeguard of excluding statements made without a knowing and intelligent waiver of the privilege. *Id.,* at 467, 475–476; see *Michigan* v. *Mosley,* 423 U. S. 96, 97 (1975); *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 246–247 (1973). Nothing in this case suggests the need for a similar pre-

sumption that a taxpayer makes disclosures on his return rather than claims the privilege because his will is overborne. In fact, a taxpayer, who can complete his return at leisure and with legal assistance, is even less subject to the psychological pressures at issue in *Miranda* than a witness who has been called to testify in judicial proceedings. Cf. *United States* v. *Kordel*, 397 U. S., at 9–10; *Miranda, supra*, at 461.

## B

Garner relies next on *Mackey* v. *United States*, 401 U. S. 667 (1971), the relevance of which can be understood only in light of *Marchetti* v. *United States*, 390 U. S. 39 (1968), and *Grosso* v. *United States*, 390 U. S. 62 (1968). In the latter cases the Court considered whether the Fifth Amendment was a defense in prosecutions for failure to file the returns required of gamblers in connection with the federal occupational and excise taxes on gambling. The Court found that any disclosures made in connection with the payment of those taxes tended to incriminate because of the pervasive criminal regulation of gambling activities. *Marchetti, supra*, at 48–49; *Grosso, supra*, at 66–67. Since submitting a claim of privilege in lieu of the returns also would incriminate, the Court held that the privilege could be exercised by simply failing to file.[11]

---

[11] As we have noted, the privilege is an exception to the general principle that the Government has the right to everyone's testimony. A corollary to that principle is that the claim of privilege ordinarily must be presented to a "tribunal" for evaluation at the time disclosures are initially sought. See *Albertson* v. *SACB*, 382 U. S. 70, 78–79 (1965); *Vajtauer* v. *Commissioner of Immigration*, 273 U. S., at 113; *Mason* v. *United States*, 244 U. S. 362, 364–365 (1917). This early evaluation of claims allows the Government to compel evidence if the claim is invalid or if immunity is granted and therefore assures that the Government obtains all the information to which it is entitled. In the gambling tax cases, however, making a claim of privi-

In *Mackey,* the disclosures required in connection with the gambling excise tax had been made before *Marchetti* and *Grosso* were decided. Mackey's returns were introduced in a criminal prosecution for income tax evasion. Although a majority of the Court considered the disclosures on the returns to have been compelled incriminations, 401 U. S., at 672 (plurality opinion); *id.,* at 704–705 (BRENNAN, J., concurring in judgment); *id.,* at 713 (Douglas, J., dissenting), Mackey was not immunized against their use because *Marchetti* and *Grosso* were held nonretroactive. 401 U. S., at 674–675 (plurality opinion); *id.,* at 700–701 (Harlan, J., concurring in judgment).[12] Garner assumes that if Mackey had made his disclosures after *Marchetti* and *Grosso,* they could not have been used against him. He then concludes that since Mackey would have been privileged to file no returns at all, *Mackey* stands for the proposition that an objection at trial always suffices to preserve the privilege even if disclosures have been made previously.

Assuming that Garner otherwise reads *Mackey* correctly,[13] we do not think that case should be applied in

lege when the disclosures were requested, *i. e.,* when the returns were due, would have identified the claimant as a gambler. The Court therefore forgave the usual requirement that the claim of privilege be presented for evaluation in favor of a "claim" by silence. See *Marchetti,* 390 U. S., at 50. Nonetheless, it was recognized that one who "claimed" the privilege by refusing to file could be required subsequently to justify his claim of privilege. See *id.,* at 61. If a particular gambler would not have incriminated himself by filing the tax returns, the privilege would not justify a failure to file.

[12] MR. JUSTICE BRENNAN, joined by MR. JUSTICE MARSHALL, concurred in the judgment on the ground that the compelled disclosure of the amount of Mackey's gambling income could be used in a prosecution for income tax evasion. See 401 U. S., at 702.

[13] It does not follow necessarily that a taxpayer would be immunized against use of disclosures made on gambling tax returns when the Fifth Amendment would have justified a failure to file at all. If *Marchetti* and *Grosso* had been held retroactive, immunization

this context. The basis for the holdings in *Marchetti* and *Grosso* was that the occupational and excise taxes on gambling required disclosures only of gamblers, the great majority of whom were likely to incriminate themselves by responding. *Marchetti, supra,* at 48–49, 57; *Grosso, supra,* at 66–68. Therefore, as in the coerced-confession cases, any compulsion to disclose was likely to compel self-incrimination.[14] Garner is differently situated. Although he disclosed himself to be a gambler, federal income tax returns are not directed at those "'inherently suspect of criminal activities.'" *Marchetti, supra,* at 52. As noted in *Albertson* v. *SACB,* 382 U. S. 70, 79 (1965), "the questions in [an] income tax return [are] neutral on their face and directed at the public at

---

might have been appropriate in Mackey's case. But at the time Mackey filed there was in fact no privilege not to file. Not only had *Marchetti* and *Grosso* not yet been decided, but *United States* v. *Kahriger,* 345 U. S. 22 (1953), and *Lewis* v. *United States,* 348 U. S. 419 (1955), previously had held that the privilege was not a defense to prosecution for failure to file the occupational tax returns. Mackey therefore was compelled to file his returns, thereby necessarily identifying himself as a gambler and thus risking self-incrimination. Accordingly, there were two related reasons to view the disclosures made in *Mackey* as compelled incriminations. The first was the inherently incriminating nature of the information demanded by the Government. See *supra,* at 658. The second was the gambler's inability to claim the privilege by refusing to file at the time Mackey's disclosures were required. Cf. *Mackey,* 401 U. S., at 704 (BRENNAN, J., concurring in judgment); *Leary* v. *United States,* 395 U. S. 6, 27–28 (1969); *Grosso,* 390 U. S., at 70–71. In the case of gambling tax returns filed after *Marchetti* and *Grosso,* the second factor would not be present.

[14] *Marchetti* and *Grosso,* of course, removed the threat of a criminal conviction when one validly claims the privilege by failing to file gambling tax returns. We do not pause here to consider whether there may be circumstances that would deprive a gambler of the free choice to claim the privilege by failing to file such returns, and therefore allow him to exclude a completed gambling tax return by claiming the privilege at trial. Cf. n. 13, *supra.*

large." The great majority of persons who file income tax returns do not incriminate themselves by disclosing their occupation. The requirement that such returns be completed and filed simply does not involve the compulsion to incriminate considered in *Mackey*.[15]

## C

Garner's final argument relies on *Garrity* v. *New Jersey*, 385 U. S. 493 (1967). There policemen summoned during an investigation of police corruption were informed that they could claim the privilege but that they would be discharged for doing so. The disclosures they made were introduced against them in subsequent criminal prosecutions. The Court held that the penalty of discharge for reliance on the privilege foreclosed a free choice to remain silent, and therefore had the effect of compelling the incriminating testimony given by the policemen. Garner notes that a taxpayer who claims the privilege on his return faces the possibility of a criminal prosecution under § 7203 for failure to make a return. He argues that the possibility of prosecution, like the threat of discharge in *Garrity*, compels a taxpayer to make incriminating disclosures rather than claim the privilege. This contention is not entirely without force, but we find it unpersuasive.

---

[15] Garner contends that whatever the case may be with regard to taxpayers in general, a gambler who might be incriminated by revealing his occupation cannot claim the privilege on the return effectively. This contention stems from the fact that certain specialized tax calculations are required only of gamblers. See § 165 (d) of the Code, 26 U. S. C. § 165 (d); Recent Cases, 86 Harv. L. Rev. 914, 916 n. 13 (1973). Garner argues that the process of claiming the privilege with respect to these calculations will reveal a gambler's occupation. We need not address this contention, since Garner found it unnecessary to make any such special calculations. 501 F. 2d, at 237 n. 3.

The policemen in *Garrity* were threatened with punishment for a concededly valid exercise of the privilege, but one in Garner's situation is at no such disadvantage. A § 7203 conviction cannot be based on a valid exercise of the privilege. This is implicit in the dictum of *United States* v. *Sullivan,* 274 U. S. 259 (1927), that the privilege may be claimed on a return.[16] Furthermore, the Court has held that an individual summoned by the Service to provide documents or testimony can rely on the privilege to defend against a § 7203 prosecution for failure to "supply any information." See *United States* v. *Murdock,* 290 U. S. 389 (1933) (*Murdock II*); *United States* v. *Murdock,* 284 U. S. 141 (1931) (*Murdock I*), disapproved on other grounds, *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52 (1964).[17] The Fifth Amendment itself guaran-

---

[16] Garner contends that *California* v. *Byers,* 402 U. S. 424 (1971), cast doubt on *Sullivan*'s dictum. The Court held in *Byers* that the privilege against compulsory self-incrimination was not violated by a statute requiring motorists involved in automobile accidents to stop and identify themselves. Garner argues that *Byers* suggests that governments always can compel answers to neutral regulatory inquiries in a self-reporting scheme and that the protection of the Fifth Amendment should be afforded in such cases solely through use immunity.

We cannot agree that *Byers* undercut *Sullivan*'s dictum. Although there was not a majority of the Court for any rationale for the *Byers* holding, the Court addressed there only the basic requirement that one's name and address be disclosed. The opinions upholding the requirement suggested that the privilege might be claimed appropriately against other questions. 402 U. S., at 434 n. 6 (plurality opinion); *id.,* at 457–458 (Harlan, J., concurring in judgment). *Byers* is thus analogous to *Sullivan,* holding only that requiring certain basic disclosures fundamental to a neutral reporting scheme does not violate the privilege.

[17] The *Murdock* cases involved predecessor statutes to § 7203, but they were identical to it in all material respects. See Internal Revenue Act of 1926, § 1265, 44 Stat. 850–851; Internal Revenue Act of 1928, § 146 (a), 45 Stat. 835.

tees the taxpayer's insulation against liability imposed on the basis of a valid and timely claim of privilege, a protection broadened by § 7203's statutory standard of "willfulness." [18]

Since a valid claim of privilege cannot be the basis for a § 7203 conviction, Garner can prevail only if the possibility that a claim made on the return will be tested in a criminal prosecution suffices in itself to deny him freedom to claim the privilege. He argues that it does so, noting that because of the threat of prosecution under § 7203 a taxpayer contemplating a claim of privilege on his return faces a more difficult choice than does a witness contemplating a claim of privilege in a judicial proceeding. If the latter claims the protection of the Fifth Amendment, he receives a judicial ruling at that time on the validity of his claim, and he has an opportunity to reconsider it before being held in contempt for refusal to answer. Cf. *Maness* v. *Meyers*, 419 U. S., at 460–461.

---

[18] Because § 7203 proscribes "willful" failures to make returns, a taxpayer is not at peril for every erroneous claim of privilege. The Government recognizes that a defendant could not properly be convicted for an erroneous claim of privilege asserted in good faith. This concession simply reflects our holding in *Murdock II*. There Murdock's claim of privilege was considered unjustified (because of the holding in *Murdock I* disapproved in *Murphy* v. *Waterfront Comm'n*). But the Court recognized that "good faith" in its assertion would entitle Murdock to acquittal.

"[T]he Government, . . . we think correctly, assumed that it carried the burden of showing more than a mere voluntary failure to supply information, with intent, in good faith, to exercise a privilege granted the witness by the Constitution." 290 U. S., at 397.

See *United States* v. *Bishop*, 412 U. S. 346 (1973). In this respect, the protection for the taxpayer in a § 7203 prosecution is broader than that for a witness who risks contempt to challenge a judicial order to disclose. In the latter case, a mere erroneous refusal to disclose warrants a sanction. See *Maness* v. *Meyers*, 419 U. S. 449, 460–461 (1975).

A § 7203 prosecution, however, may be brought without a preliminary judicial ruling on a claim of privilege that would allow the taxpayer to reconsider.[19]

In essence, Garner contends that the Fifth Amendment guarantee requires such a preliminary-ruling procedure for testing the validity of an asserted privilege. It may be that such a procedure would serve the best interests of the Government as well as of the taxpayer, cf. *Emspak* v. *United States,* 349 U. S. 190, 213–214 (1955) (Harlan, J., dissenting), but we certainly cannot say that the Constitution requires it. The Court previously has considered Fifth Amendment claims in the context of a criminal prosecution where the defendant did not have the benefit of a preliminary judicial ruling on a claim of privilege. It has never intimated that such a procedure is other than permissible. Indeed, the Court has given some measure of endorsement to it. In *Murdock I, supra,* an individual was prosecuted under predecessors of § 7203 for refusing to make disclosures after being summoned by the Bureau of Internal Revenue.[20] In this Court he contended, apparently on statutory grounds, that there could be no prosecution without a prior judicial enforcement suit to allow presentation of his claim of privilege to a court for a preliminary ruling. The Court said:

> "While undoubtedly the right of a witness to refuse to answer lest he incriminate himself may be tested in proceedings to compel answer, there is no support for the contention that there must be such a deter-

[19] The Government advised us at oral argument that a claim of privilege would stimulate rulings by the Service. It is doubtful, therefore, that a claimant would find himself prosecuted with no prior indication that the Service considered his claim invalid. The claimant, however, would not have a judicial assessment of his claim.

[20] See n. 17, *supra.*

mination of that question before prosecution for the willful failure so denounced." 284 U. S., at 148. See also *Quinn* v. *United States,* 349 U. S. 155, 167–170 (1955); *Emspak* v. *United States, supra,* at 213–214 (Harlan, J., dissenting).

We are satisfied that *Murdock I* states the constitutional standard. What is at issue here is principally a matter of timing and procedure. As long as a valid and timely claim of privilege is available as a defense to a taxpayer prosecuted for failure to make a return, the taxpayer has not been denied a free choice to remain silent merely because of the absence of a preliminary judicial ruling on his claim. We therefore do not agree that Garner was deterred from claiming the privilege in the sense that was true of the policemen in *Garrity.*

### V

In summary, we conclude that since Garner made disclosures instead of claiming the privilege on his tax returns, his disclosures were not compelled incriminations.[21] He therefore was foreclosed from invoking the privilege when such information was later introduced as evidence against him in a criminal prosecution.

The judgment is

*Affirmed.*

---

[21] No language in this opinion is to be read as allowing a taxpayer desiring the protection of the privilege to make disclosures concurrently with a claim of privilege and thereby to immunize himself against the use of such disclosures. If a taxpayer desires the protection of the privilege, he must claim it instead of making disclosures. Any other rule would deprive the Government of its choice between compelling the evidence from the claimant in exchange for immunity and avoiding the burdens of immunization by obtaining the evidence elsewhere. See *Mackey* v. *United States,* 401 U. S., at 711–713 (Brennan, J., concurring in judgment).

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, concurring in the judgment.

I agree with the Court that petitioner, having made incriminating disclosures on his income tax returns rather than having claimed the privilege against self-incrimination, cannot thereafter assert the privilege to bar the introduction of his returns in a criminal prosecution. I disagree, however, with the Court's rationale, which is far broader than is either necessary or appropriate to dispose of this case.

This case ultimately turns on a simple question— whether the possibility of being prosecuted under 26 U. S. C. § 7203 for failure to make a return compels a taxpayer to make an incriminating disclosure rather than claim the privilege against self-incrimination on his return. In discussing this question, the Court notes that only a "willful" failure to make a return is punishable under § 7203, and that "a defendant could not properly be convicted for an erroneous claim of privilege asserted in good faith." *Ante,* at 663 n. 18. Since a good-faith erroneous assertion of the privilege does not expose a taxpayer to criminal liability, I would hold that the threat of prosecution does not compel incriminating disclosures in violation of the Fifth Amendment. The protection accorded a good-faith assertion of the privilege effectively preserves the taxpayer's freedom to choose between making incriminating disclosures and claiming his Fifth Amendment privilege, and I would affirm the judgment of the Court of Appeals for that reason.

Not content to rest its decision on that ground, the Court decides that even if a good-faith erroneous assertion of the privilege could form the basis for criminal

liability, the threat of prosecution does not amount to compulsion. It is constitutionally sufficient, according to the Court, that a *valid* claim of privilege is a defense to a § 7203 prosecution. *Ante,* at 662–665. In so holding, the Court answers a question that by its own admission is not presented by the facts of this case. And, contrary to the implication contained in the Court's opinion, the question is one of first impression in this Court.

Citing *United States* v. *Murdock,* 284 U. S. 141 (1931) (*Murdock I*), the Court observes that a taxpayer who claims the privilege on his return can be convicted of a § 7203 violation without having been given a preliminary ruling on the validity of his claim and a "second chance" to complete his return after his claim is rejected. The Court then leaps to the conclusion that the Fifth Amendment is satisfied as long as a valid claim of privilege is a defense to a § 7203 prosecution.

I accept the proposition that a preliminary ruling is not a prerequisite to a § 7203 prosecution. But cf. *Quinn* v. *United States,* 349 U. S. 155, 165–170 (1955). But it does not follow, and *Murdock I* does not hold, that the absence of a preliminary ruling is of no import in considering whether a defense of good-faith assertion of the privilege is constitutionally required.* It is one thing to deny a good-faith defense to a witness who is given a prompt ruling on the validity of his claim of privilege and an opportunity to reconsider his refusal to testify before subjecting himself to possible punishment for contempt. See, *e. g., Maness* v. *Meyers,* 419 U. S. 449, 460–461 (1975). It would be quite another to deny a good-faith defense to someone like petitioner, who may

---

*Indeed, as the Court notes, *ante,* at 663 n. 18, the Court held that Murdock was entitled to acquittal if his assertion of the privilege was in good faith. *United States* v. *Murdock,* 290 U. S. 389 (1933) (*Murdock II*).

be denied a ruling on the validity of his claim of privilege until his criminal prosecution, when it is too late to reconsider. If, contrary to the undisputed fact, a taxpayer had no assurance of either a preliminary ruling or a defense of good-faith assertion of the privilege, he could claim the privilege only at the risk that an erroneous assessment of the law of self-incrimination would subject him to criminal liability. In that event, I would consider the taxpayer to have been denied the free choice to claim the privilege, and would view any incriminating disclosures on his tax return as "compelled" within the meaning of the Fifth Amendment. Only because a good-faith erroneous claim of privilege entitles a taxpayer to acquittal under § 7203 can I conclude that petitioner's disclosures are admissible against him.