Patrick Mike **BEAVER**, Appellant,

v.

**STATE of Alaska**, Appellee.

No. A–6049.

Court of Appeals of Alaska.

March 14, 1997.

 

Scott Jay Sidell, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

*OPINION*

MANNHEIMER, Judge.

In 1992, Patrick Mike Beaver was adjudicated delinquent for committing first- and second-degree sexual abuse of a minor upon a six-year-old child. He was institutionalized for almost two years. During his stay in the juvenile facility, Beaver participated in sex offender treatment.

A few days following his release from the juvenile facility, Beaver began to sexually abuse another child. This sexual abuse continued for seven months, until Beaver was arrested. Beaver eventually pleaded no contest to one count of second-degree sexual abuse of a minor. At Beaver's sentencing, the State relied on various statements that Beaver had made during his sex offender treatment in the juvenile facility. In this appeal, Beaver argues that the State was barred from relying on those statements.

Beaver contends that his statements during sex offender therapy were obtained in violation of his privilege against self-incrimination. He argues in the alternative that he was entitled to *Miranda* warnings before he participated in the sex offender therapy sessions. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). For the reasons explained in this opinion, we conclude that the statements Beaver made during sex offender therapy were not obtained in violation of his privilege against self-incrimination, and we further conclude that Beaver was not entitled to *Miranda* warnings. We therefore affirm the judgement of the superior court.

*Facts surrounding Beaver's sex offender therapy and the statements he made during this therapy*

Because of his adjudication as a delinquent minor, Beaver was ordered institutionalized

until May 31, 1994. The Department of Health and Social Services placed Beaver at the Bethel Youth Facility. The superior court had not ordered Beaver to participate in sex offender treatment, but one of the counselors at the Youth Facility approached Beaver and encouraged him to voluntarily participate in the therapy.

Before beginning sex offender therapy, Beaver was asked to sign a "contract" governing the therapy. The contract reiterated that Beaver's participation in sex offender therapy was voluntary. The contract advised Beaver that staff members would be making written reports concerning his therapy participation, and that these reports would become part of his institutional record. In addition, the contract explicitly warned Beaver that any disclosures he made during therapy would not be confidential—that if he revealed other crimes, this information might be forwarded to the police. Because of this lack of confidentiality, the contract assured Beaver that he was not required to reveal any identifying details of past offenses. The pertinent clause of the contract stated:

> I understand that if I tell specific dates, times, location, events, and/or identities of victims regarding crimes for which I have not been charged or convicted, staff members may be required by law to report this to the law enforcement agencies[.] ... I further understand that I could be subject to prosecution for these crimes. I further understand that I am expected to discuss all of my past as well as current offenses, but that I am *not* required to reveal any of the specifics outlined above.

(Emphasis in the original.)

Beaver agreed to this contract and began sex offender therapy. During Beaver's ensuing therapy, he made statements about the crimes for which he had been adjudicated delinquent. He also made statements about other sex crimes he had committed.[1] In addition, shortly before his release from the Bethel Youth Facility, Beaver told his counselor that he felt there was a "90–percent

chance" that he would again sexually abuse a child, and he revealed that he had already selected his next victim.

As already noted, Beaver began to sexually abuse a fourteen-year-old boy just days after his release from the Youth Facility. This abuse lasted for several months, leading to Beaver's indictment and eventual conviction for second-degree sexual abuse of a minor (sexual penetration with a child between the ages of 13 and 16), AS 11.41.436(a)(1). The pre-sentence report prepared in Beaver's case contained references to Beaver's statements during sex offender therapy—in particular, Beaver's admissions that he had committed other acts of sexual abuse before he was institutionalized, his prediction that he would likely re-offend, and his statement that he had already selected his next victim.

Beaver asked the superior court to strike these statements from the pre-sentence report and to prohibit the State from relying on them in any other way. Beaver argued that his statements during therapy had been obtained in violation of his privilege against self-incrimination. He also argued that, because he had been in custody during the therapy, he should have received *Miranda* warnings before the counselors asked him to discuss other offenses.

The superior court held an evidentiary hearing to determine the circumstances surrounding Beaver's decision to enter the sex offender therapy program, and to determine the manner in which that therapy had been conducted. As explained in more detail below, the superior court found that Beaver had voluntarily entered sex offender therapy—that he had not been coerced into joining the therapy program. The court further found that Beaver's therapy counselors had not tried to elicit incriminating statements from Beaver—that the counselors had in fact warned Beaver against providing identifying details of his prior offenses.

---

1. These statements were sufficiently detailed that the Youth Facility staff reported them to the authorities. However, Beaver was not prosecuted for these newly revealed offenses—apparently because the offenses were committed while Bea-

ver was a juvenile and because no additional penalty could be imposed on Beaver under the juvenile system (*i.e.,* Beaver had already been ordered institutionalized until his twentieth birthday).

Based on these findings, the superior court denied Beaver's motion to suppress the statements he made during therapy. Those statements remained in the pre-sentence report, and the court later relied on them when sentencing Beaver. In this appeal, Beaver renews his arguments that those statements should have been suppressed.

*Was Beaver's privilege against self-incrimination violated when he was asked to discuss other crimes during sex offender therapy?*

The privilege against self-incrimination[2] protects individuals from being compelled to reveal information that could potentially incriminate them. However, as we recently discussed in *Williams v. State*, 928 P.2d 600 (Alaska App.1996), the privilege against self-incrimination is normally lost if a person fails to assert it. This is true even when the person is under a compulsion to answer questions—for example, a witness testifying under subpoena, *Garner v. United States*, 424 U.S. 648, 653, 96 S.Ct. 1178, 1182, 47 L.Ed.2d 370 (1976), or a probationer being interviewed by their probation officer, *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984).

These cases clarify that the "compulsion" outlawed by the Constitution is not the person's obligation to appear and to submit to questioning. Rather, "compulsion" exists when a person is compelled or coerced to give up the protection of the privilege. This might occur when a court erroneously overrules a valid claim of privilege and directs a witness to provide a potentially incriminating answer or face punishment for contempt. It might also occur when a witness is threatened with adverse consequences simply for claiming the privilege and, because of this, decides to relinquish the privilege and provide potentially incriminating information. *Murphy*, 465 U.S. at 434–35, 104 S.Ct. at 1145.

When Beaver participated in sex offender therapy at the Bethel Youth Facility, he never invoked his privilege against self-incrimi-

nation. Thus, he was never ordered to answer questions over a claim of privilege. Normally, this would lead to the conclusion that he voluntarily relinquished his privilege against self-incrimination.

However, Beaver asserts that the rules governing the Bethel Youth Facility coerced him to participate in the sex offender therapy program, and that the criteria used to grade his success in the sex offender therapy program required him to reveal incriminating information during his therapy sessions. Thus, Beaver contends, in order to maintain an acceptable inmate status at the Youth Facility, he was forced to relinquish his privilege against self-incrimination when he otherwise would have claimed it.

Beaver's argument rests on three assertions of fact: first, that the Youth Facility required him to participate in sex offender therapy; second, that the counselors running the therapy program made it clear to Beaver that self-incriminatory statements were a requirement of his satisfactory participation in the program; and third, that Beaver would have claimed his privilege against self-incrimination had it not been for this alleged institutional coercion. As explained below, the superior court explicitly rejected Beaver's first and second assertions of fact, and Beaver presented no evidence on the third.

When Beaver objected to inclusion of the challenged statements in the pre-sentence report, Superior Court Judge Richard D. Savell held a hearing so that Beaver could present evidence to support his assertions. Only one witness testified at this hearing: David Matthews, a counselor at the Bethel Youth Facility who works in the sex offender therapy program.

Based upon Matthews's testimony, Judge Savell found that Beaver's participation in the sex offender therapy program had been completely voluntary. The judge found that Beaver knew it was his choice whether to participate or not, and he knew that this choice would not affect the length of his confinement:

---

**2.** Fifth Amendment to the United States Constitution and Article I, Section 9 of the Alaska Constitution.

[Beaver's] [p]articipation in the sex offender group at the youth facility [was] not mandatory. It [was] voluntary[.] ... Beaver's term of custody [would expire on] May 31, 1994, regardless of whether or not he participated in [sex offender] treatment. The youth facility did not have the power or discretion to either lengthen or shorten Beaver's residence at the facility. Sex offenders ... are told that[, regardless of whether they participate in sex offender therapy,] they must stay [in the facility] until the expiration of their institutional order.

[When] Matthews approached Beaver about participation in the sex offender group[,][h]e explained that it was voluntary[.] ... There were no sanctions, punishments, or loss of privileges for not joining the group. And while the [treatment] contract stated that attendance was required at all group sessions, participants were, in fact, free to refuse to attend any session or to attend and not participate, as ... Beaver [himself did] on occasion.[3]

Moreover, Judge Savell found that, even after Beaver signed up for sex offender therapy, he remained free to "stay in his room and not attend group sessions" or, if he chose to attend the sessions, he was "free [to] remain silent" during the sessions.

Judge Savell further rejected Beaver's claim that his participation in the sex offender therapy program would not be deemed satisfactory unless he revealed incriminating information about past offenses. Judge Savell found that the Youth Facility counselors had explicitly told Beaver that his participation in the sex offender therapy program did not require him to reveal details of prior offenses. In fact, the counselors warned

Beaver not to reveal details of prior offenses—because he might face prosecution if he disclosed such details:

Matthews ... presented Beaver with a written treatment contract. Beaver signed the contract, keeping a copy, and entered the program.... The contract [declares] that disclosure of details of past [acts of sexual] abuse (dates, places, times, identity of victims) is not required[,] and [it warns] that if such details are disclosed they have to be reported to police agencies and could lead to his prosecution for these crimes.

Finally, Judge Savell noted that Beaver had submitted the issue to the court on Matthews's testimony alone. Beaver presented no evidence to controvert Matthews's testimony that Beaver entered treatment voluntarily and that he could have refused to participate. Nor did Beaver present any evidence to controvert Matthews's testimony that inmates participating in sex offender therapy are not compelled to make incriminatory disclosures (and are in fact warned against doing so). Along these same lines, we note that Beaver presented no evidence that he wished to assert his privilege against self-incrimination but felt pressured not to do so.

On appeal, Beaver argues that Judge Savell adopted an overly simplistic view of institutional life when he found that Beaver was under no compulsion to participate in the sex offender therapy group. Beaver contends that an inmate's status and privileges within the Bethel Youth Facility depend in large measure on the staff's subjective appraisal of his behavior and his willingness to rehabilitate himself. These institutional pressures, Beaver argues, essentially forced him to "choose" to attend sex offender therapy.

3. In his brief to this court, Beaver asserts that Bethel Youth Facility records reveal "that Beaver was in fact punished for not participating in treatment during the first month of his incarceration". To support this assertion, Beaver cites a page from his Division of Family and Youth Services (DFYS) annual review. The author of the annual review notes that Beaver was placed on restricted status "for his lack of participation in group and individual counseling". However, it appears that this is a reference to Beaver's lack of participation in the general counseling that occurs at the Youth Facility, not sex offender

therapy. The author states that Beaver's restricted status occurred during his first month at the Youth Facility; only in a later paragraph of the annual review does the author speak of Beaver's "[beginning] to attend the Sex Offender Group".

In other words, the portion of the record cited by Beaver does not appear to support his assertion that he was penalized for failing to participate in sex offender counseling. To the extent that the cited portion of the annual review might be construed to suggest this possibility, Beaver failed to raise this issue in the trial court; thus, the potential ambiguity was never clarified.

As noted above, Judge Savell rejected Beaver's argument that the possibility of greater inmate privileges constituted a "compulsion" on Beaver to participate in sex offender therapy. Beaver does not argue that Judge Savell misconstrued the facts of his confinement, only the legal significance of these facts. Beaver argues that the possibility of pleasing corrections authorities and thus gaining greater institutional privileges is, for constitutional purposes, a "compulsion" on inmates to participate in rehabilitative programs. However, Beaver presents no case authority to support his argument. In fact, as discussed in the next section of this opinion, case law on this subject rejects Beaver's argument.

Further, the broad implications of Beaver's argument make it suspect: if we were to adopt Beaver's reasoning, scarcely any utterance or decision made by an inmate in any institution (penal, juvenile, or psychiatric) would be "voluntary" for constitutional purposes. We therefore uphold Judge Savell's ruling that Beaver voluntarily participated in sex offender therapy.

Even if we assumed for purposes of argument that Beaver's choice to attend sex offender therapy was not completely voluntary, this brings Beaver only one step toward his goal of proving a Fifth Amendment violation. Beaver must still show that the counselors running the therapy program coerced him to incriminate himself by threatening to penalize him if he did not reveal incriminating information, and Beaver must also point to some evidence to support his contention that he would have asserted his privilege against self-incrimination during the sex offender counseling had it not been for this institutional coercion. *Murphy,* 465 U.S. at 427–29, 434–36, 104 S.Ct. at 1142–43, 1146–48.

In his brief to this court, Beaver asserts that, as a participant in the sex offender therapy program, "he was expected to discuss, under threat of punishment and promise of reward, all of his past and [planned] future criminal conduct". As explained above, Judge Savell reached exactly the opposite conclusion. Judge Savell found that candidates for the sex offender therapy program were explicitly told (before they began the program) that, even though they would be asked to discuss their past behavior, they were not required to speak about "the specific dates, times, location, events, and/or [the] identities of [the] victims" of any offenses. In fact, not only were prospective participants told that their counselors would not be seeking such revelations, but participants were also affirmatively warned that, because of the risk of future prosecution, they should not speak about such things in their counseling sessions.

Beaver offers nothing to show that Judge Savell's findings of fact are clearly erroneous. *Wilburn v. State,* 816 P.2d 907, 911 (Alaska App.1991) (a trial court's findings of fact made in connection with a motion to suppress evidence are reviewed under the "clearly erroneous" standard). Given Judge Savell's findings, Beaver's claim that he was pressured into revealing his past offenses has no merit.

Finally, as explained above, even when a person is under pressure (or even legal compulsion) to answer questions, there is no "compulsion" in a Fifth Amendment sense unless the person is pressured to relinquish the protection of the privilege against self-incrimination. Beaver points to no evidence suggesting that he wished to assert his privilege against self-incrimination at any point during the sex offender counseling sessions. The record (especially the explicit warning to participants not to discuss the details of other crimes) gives every reason to believe that the authorities would have honored an assertion of the privilege (if Beaver had asserted it).

For these reasons, we conclude that the authorities did not violate Beaver's privilege against self-incrimination when they asked him to discuss his past conduct during sex offender therapy. Beaver was not coerced into revealing incriminatory information; thus, the privilege against self-incrimination did not bar the superior court from relying on that information when the court sentenced Beaver for a new crime.[4]

4. As we did in *Williams,* 928 P.2d at 605 n. 1, we    again note but do not decide a subsidiary legal

██ With respect to Beaver's statements concerning his intended future conduct (his assessment that he would likely reoffend, and his statement that he had already selected his next victim), Beaver has even less of a Fifth Amendment claim. The only foreseeable circumstance in which Beaver might suffer criminal consequences on account of these statements was if he later committed another crime. The Fifth Amendment does not protect against this danger. *M.R.S. v. State,* 867 P.2d 836, 840 (Alaska App.1994), *reversed on other grounds,* 897 P.2d 63 (Alaska 1995); *United States v. Apfelbaum,* 445 U.S. 115, 128, 100 S.Ct. 948, 955, 63 L.Ed.2d 250 (1980); *Marchetti v. United States,* 390 U.S. 39, 53–54, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968).

*Was Beaver entitled to Miranda warnings before he participated in sex offender therapy sessions?*

██ Beaver argues in the alternative that inmates in a jail or a juvenile facility are under inherent pressure to cooperate with correctional authorities and to participate in rehabilitative programs. Even if an inmate's decision to participate in sex offender therapy is not "compelled" as that term is defined for purposes of the Fifth Amendment, Beaver contends that such a decision is nevertheless inevitably tainted by coercion. According to Beaver, this coercion arises because inmates know that their prisoner classification (and thus the quality of their life within the correctional facility) depends to a substantial degree on the authorities' appraisal of their willingness to cooperate and their attitude toward rehabilitation. Because of this inherent coercion, Beaver argues, the

law should require therapists and counselors to give *Miranda* warnings before they ask an institutionalized person to discuss potentially incriminatory matters during therapy. *Compare Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (before police officers subject a person to custodial interrogation, the officers must advise the person of the right to remain silent, the right to cease answering questions at any time, the right to obtain the advice of a lawyer before answering questions, and the right to obtain a lawyer at government expense if the person can not afford to hire one).

██ The unadorned fact that government-employed counselors engaged in discussions with Beaver while he was an inmate at the Youth Facility is not enough to trigger the need for *Miranda* warnings. *Illinois v. Perkins,* 496 U.S. 292, 297, 110 S.Ct. 2394, 2397–98, 110 L.Ed.2d 243 (1990) (rejecting the argument "that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent"). *Miranda* warnings are required only when a person is subjected to custodial interrogation. In *Perkins,* the Supreme Court clarified that "custodial interrogation" refers to more than simply posing questions to someone who is in custody:

> The warning mandated by *Miranda* was meant to preserve the privilege [against self-incrimination] during "incommunicado interrogation of individuals in a police dominated atmosphere" ... that generate[s] "inherently compelling pressures ... to undermine the individual's will to resist and to compel him to speak [when] he would not otherwise do so freely."

issue raised by Beaver's case.

Fifth Amendment law distinguishes between (a) the possibility that Beaver's statements about past, unprosecuted offenses might lead the authorities to investigate these offenses and prosecute Beaver for them, and (b) the possibility that these statements might work to Beaver's disadvantage if he ever committed a new crime. The Fifth Amendment protects Beaver against possibility (a), but it does not protect Beaver against possibility (b). *Williams, supra.*

As explained above (in footnote 1), the State of Alaska apparently considered possibility (a)—prosecuting Beaver for the past juvenile offenses he had revealed—but decided against it because

Beaver was already institutionalized until his twentieth birthday. Thus, by the time Beaver raised his Fifth Amendment claim, only possibility (b) remained—the possibility that the State would make adverse use of this information at Beaver's sentencing for a new crime.

This raises the question: if a statement is potentially incriminating when made, but if that potential for incrimination has disappeared by the time the government wishes to use the statement, does the Fifth Amendment block use of the statement? We need not resolve this issue because we hold that Beaver was not compelled to make the incriminatory statements.

*Perkins,* 496 U.S. at 296, 110 S.Ct. at 2397. Stated differently, even when the person being questioned is incarcerated,

> [t]he standard for determining *Miranda* custody [remains] objective: *Miranda* warnings are required [when] police interrogation [is] conducted under circumstances in which a "reasonable person would feel he was not free to ... break off the questioning". *Hunter v. State,* 590 P.2d 888, 895 (Alaska 1979).

*Carr v. State,* 840 P.2d 1000, 1003 (Alaska App.1992). *Miranda* warnings are not required if the inmate is not being subjected to the type of compulsion envisioned in *Miranda*—a compulsion to speak arising from "the interaction of custody and official interrogation". *Carr,* 840 P.2d at 1003 (quoting *Perkins,* 496 U.S. at 297, 110 S.Ct. at 2397).

In *Perkins* and *Carr,* the police used secret agents to engage prison inmates in conversation about their crimes. In both instances, the inmates remained unaware that their answers were being relayed to law enforcement officials. The inmates were not subjected to either "formal questioning [or] a personal confrontation with a law enforcement officer". *Carr,* 840 P.2d at 1004. There was nothing in the record to indicate that the inmates felt compulsion to engage in conversation with the informants or to answer their questions about criminal activities. Nor was there anything to indicate that the inmates did not feel free to break off the conversations at any time. Thus, in both *Perkins* and *Carr,* the inmates were not entitled to *Miranda* warnings.

Beaver acknowledges that his status as an inmate at the Youth Facility did not automatically turn all his conversations with counselors and guards into "custodial interrogations". Beaver points out, however, that his case is distinguishable from the facts of *Perkins* and *Carr,* in that Beaver knew he was being questioned by Youth Facility counselors who had a significant degree of control over him (more specifically, control over his inmate classification within the Youth Facility). Beaver argues that he was pressured into joining the sex offender therapy group and that, once a member of the group, he was pressured into revealing incriminating information to his counselors. These institutional pressures, Beaver asserts, were the equivalent of the psychological pressures exerted on a newly-arrested suspect who is subjected to incommunicado interrogation. Thus, Beaver argues, he was entitled to *Miranda* warnings before his sex offender therapy sessions.

Beaver's argument is completely at odds with the facts as found by Judge Savell. As explained above, Judge Savell flatly rejected Beaver's contention that he was coerced into joining sex offender therapy. Based on the evidence presented at the hearing, Judge Savell concluded that Beaver had voluntarily decided to participate in the sex offender therapy program after being assured that "[t]here were no sanctions, punishments, or loss of privileges for not joining the [therapy] group". Moreover, Judge Savell found that, even after Beaver signed up for sex offender therapy, Beaver remained free to "stay in his room and not attend group sessions", and Beaver was likewise "free to attend [but to] remain silent".

Judge Savell further rejected Beaver's contention that the possibility of obtaining greater inmate privileges (by favorably impressing the Youth Facility staff) was such a strong compulsion to join the therapy program that Beaver was incapable of exerting his normal will. Recently, the Washington Supreme Court reached the same conclusion in *State v. Warner,* 125 Wash.2d 876, 889 P.2d 479 (1995).

The defendant in *Warner* was declared delinquent and institutionalized for sexually abusing a child. While incarcerated, Warner participated in sex offender therapy and, during group therapy sessions, Warner disclosed that he had abused other children. Warner was later charged with these additional offenses. He moved to suppress his admissions, claiming that he should have received *Miranda* warnings before he was asked about other offenses in his sex offender therapy. The Washington court disagreed:

> Arguably, there was some compulsion here[,] in that ... Warner could have felt [that] cooperation (i.e., making confessions) would lead to more lenient treatment or

avoid reprisals. This type of "compulsion" is not contemplated in *Miranda,* however.... When dealing with a person already incarcerated, "custodial" means more than just the normal restrictions on freedom incident to incarceration.... In [*State v.] Post,* [118 Wash.2d 596, 826 P.2d 172 (Wash.1992),] this court rejected the argument that an interview by a Department of Corrections psychologist was custodial where the [inmate being interviewed] was on work release, even though "Post was 'required' to submit to [this] evaluation in the sense that it was widely known that[,] if individuals did not cooperate during the interview process, it was a factor considered against them." *Post,* ... 826 P.2d [at 181 n. 5]. We held that [such] psychological pressure is not enough to establish "custody" for *Miranda* purposes. *Post,* ... 826 P.2d [at 180]. [Likewise, the] circumstances surrounding Mr. Warner's disclosures [during sex offender therapy] cannot be considered "custodial" [for *Miranda* purposes].

*Warner,* 889 P.2d at 482–83.

Beaver's case presents even less of an argument for finding "coercion" and requiring *Miranda* warnings. Even assuming that Beaver's decision to join sex offender therapy might have been influenced by psychological pressure (in the form of a desire to gain increased inmate privileges), and even assuming that such psychological pressure might have amounted to "coercion" for *Miranda* purposes, Judge Savell found that Beaver was not coerced to incriminate himself in the therapy sessions. Just the opposite: Beaver's counselors expressly told him that they did not wish to hear any identifying details of his prior offenses. Indeed, the counselors warned Beaver that if he did volunteer identifying details of past offenses, he might be prosecuted for those offenses.

The record unambiguously supports Judge Savell's finding; it completely belies Beaver's claim that the authorities coerced him to make incriminating statements so that they might prosecute him for other crimes. Beaver was not subjected to "inherently compelling pressures [designed] to undermine [his] will to resist and to compel him to speak [when] he would not otherwise do so freely". *Perkins,* 496 U.S. at 296, 110 S.Ct. at 2397 (quoting *Miranda,* 384 U.S. at 467, 86 S.Ct. at 1612). We therefore hold that the counselors in the sex offender therapy program were not required to administer *Miranda* warnings to Beaver.

*Conclusion*

Beaver's statements concerning his other crimes were not obtained in violation of his privilege against self-incrimination. Further, the counselors at the Youth Facility were not required to give Beaver *Miranda* warnings before the sex offender therapy sessions. Beaver's statements were therefore admissible against him at his sentencing. Accordingly, the judgement of the superior court is AFFIRMED.